UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KARRY BETH KRUEGER,

                         Plaintiff,               Civil Action No. 15-10393
                                              Honorable Linda V. Parker
                                              Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                         Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 12]**

Plaintiff Karry Beth Krueger ("Krueger") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 12], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Krueger is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [12] be DENIED, Krueger's Motion for Summary Judgment [11] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.

## II.     REPORT

### A.     Procedural History

On September 6, 2012, Krueger filed an application for DIB, alleging a disability onset date of June 19, 2010.  (Tr. 143-46).  This application was denied initially on December 13, 2012.  (Tr. 79-82).  Krueger filed a timely request for an administrative hearing, which was held on December 4, 2013, before ALJ Patricia McKay.  (Tr. 26-55).  Krueger, who was represented by attorney Kenneth Laritz, testified at the hearing, as did vocational expert Kelly Stroker.  (*Id.*).  On February 28, 2014, the ALJ issued a written decision finding that Krueger is not disabled under the Act.  (Tr. 12-21).  On January 22, 2015, the Appeals Council denied review.  (Tr. 1-5).  Krueger timely filed for judicial review of the final decision on January 29, 2015.  (Doc. #1).

### B.     Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled

regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C.    Background

### 1.    Krueger's Reports and Testimony

In an undated disability report, Krueger, who was born in 1974, indicated that she is 5'7" tall and weighs 180 pounds.  (Tr. 164, 168).  She alleges she is disabled as a result of Arnold-Chiari malformation,[1] migraine headaches, anxiety, and depression.  (Tr. 168).  At the time of the administrative hearing, she lived in a house with her husband and her two minor children. (Tr. 31).  She completed high school and two years of college.  (Tr. 32, 169).  Previously, Krueger worked as an x-ray technician, phlebotomist, and data entry clerk.  (Tr. 34, 194).  She stopped working on June 19, 2010, because of her headaches.  (Tr. 168).  In 2011, she completed cosmetology school but ultimately was unable to work in this field.  (Tr. 33).

---

[1] "Arnold-Chiari malformation is a defect in which a part of the cerebellum … is elongated and projects into the upper cervical canal.  Classification as type I or type II is based on the extent of the anomaly.  Type I is often asymptomatic and is not associated with hydrocephalus [, which is characterized by swelling of the cerebral ventricles and an accumulation of cerebrospinal fluid within the skull], whereas hydrocephalus is present in about 50 percent of cases of type II …."  *St. Louis v. Comm'r of Soc. Sec.*, 2011 WL 2414513, at *1 n. 1 (D. Vt. June 15, 2011) (citation omitted).

3

In a November 2012 function report, Krueger indicated that she suffers from uncontrollable headaches, right-sided arm weakness, and extreme dizzy spells. (Tr. 186). She has difficulty sleeping due to her headaches, which occur on a daily basis and are of varying intensity. (Tr. 40, 44, 187). She is able to get her children dressed and drive her son to and from daycare (less than one mile each way), care for her cat, attend to her own personal care (although she sometimes needs help with her hair), and prepare her own meals. (Tr. 37-38, 187-88). She is able to do a "little bit" of housework (laundry, cleaning, etc.) each day, but needs assistance and has to "rest often." (Tr. 38, 188). In her function report, Krueger indicated that she was able to shop for groceries; at the hearing, however, she testified that her husband "does the grocery shopping." (Tr. 39, 189). Previously, she enjoyed bowling and watching television; however, she can no longer bowl, and rarely watches television because it makes her dizzy. (Tr. 45, 190).

Krueger indicated that she has difficulty lifting, bending, walking, seeing, completing tasks, using her hands, and concentrating. (Tr. 191). Specifically, her right-sided weakness makes it difficult for her to lift; her balance is "off," which affects her walking; her headaches make it difficult to see, concentrate, and complete tasks; and she gets dizzy bending over. (Tr. 43-44, 191). She wears dark sunglasses every day (even inside the house) because light makes her headaches worse. (Tr. 43, 45). She rarely leaves the house, saying that "between the headaches and the depression," she does not want to get out of bed. (Tr. 191). At least once a week, she gets the type of headache that requires her to "just medicate [herself] and curl up in a ball and just stay in the dark." (Tr. 44-45). When she gets these headaches, she often vomits multiple times; she has a "cocktail" of medications to take at home under these circumstances, and if that proves ineffective, she ends up in the hospital. (Tr. 45). Krueger testified that she "wake[s] up every day not wanting to live" and has attempted suicide twice. (Tr. 41).

4

2. *Medical Evidence*

a. *Treating Sources*

After presenting to Michigan Neurology Associates with a headache and difficulty balancing in May 2010 (Tr. 371-72), Krueger underwent an MRI and MRA of the brain without contrast on June 1, 2010 (Tr. 235-36, 382-83). No signal was seen in the posterior communicating artery on the left, and multiple small lesions were seen in the deep white matter bilaterally. (*Id.*). Krueger was diagnosed with a Chiari I malformation (Tr. 383) and prescribed several medications, including Maxalt for "breakthrough pain" (Tr. 371).

On June 14, 2010, Krueger returned to Michigan Neurology Associates, complaining of continuing chronic headaches, for which Maxalt had been ineffective. (Tr. 370). Dr. Joupperi ordered an MRI of the brain with contrast, which was performed on June 17, 2010. (Tr. 370, 379-80). This MRI confirmed a Chiari I malformation and suggested abnormal soft tissue in the midline, posterior to the brain stem at the level of the cerebellum. (Tr. 379-80).

On June 21, 2010, Krueger presented to the emergency room, complaining of a headache, dizziness, and right upper extremity weakness. (Tr. 354-58). She was admitted to the hospital for three days and advised to follow up with neurosurgery after discharge. (Tr. 361). On June 27, 2010, Krueger returned to the emergency room with a headache, nausea, and vomiting. (Tr. 346). She was admitted to the hospital for brain surgery and, that same day, underwent a decompressive suboccipital craniectomy, with decompression of the foramen magnum, and decompressive laminectomy at C1. (Tr. 350-53). Krueger was discharged from the hospital on July 2, 2010, but by July 4, she was back in the emergency room, again complaining of a headache, throat pain, and dizziness. (Tr. 340-45). Again, she was admitted to the hospital for treatment. (Tr. 345).

On November 8, 2010, Krueger was seen at the Neurology Ataxia Clinic at the University of Michigan for evaluation and management of headaches, right arm heaviness, and right leg pain. (Tr. 237-40). She reported right-sided, throbbing headaches (8/10 on the pain scale), associated with nausea, vomiting, photophobia, and phonophobia. (Tr. 237). The headaches occurred twice a week and lasted up to two days at a time, during which time she would feel dizzy and experience motion sickness. (*Id.*). It was suspected that Krueger's headaches were not related to her Chiari malformation but, instead, were consistent with migraine headaches, and her Elavil dose was increased. (Tr. 239).

On November 27, 2010, Krueger returned to the emergency room with a headache (10/10 on the pain scale), nausea, and vomiting. (Tr. 335-39). She received IV pain medication, which provided "mild relief," and was advised to follow up with her primary care physician. (Tr. 338).

On March 14, 2011, Krueger underwent another MRI of her brain, which revealed small nonspecific white matter signal abnormalities. (Tr. 233). A follow-up MRI was recommended in three months to evaluate the stability of her condition. (*Id.*).

On March 15, 2011, Krueger again presented to the emergency room with a headache and nausea. (Tr. 331-34). Three months later, on June 17, 2011, she returned to the emergency room, complaining of a right-sided headache and facial pain. (Tr. 322-27). CT scans of her orbits and brain were performed, both of which were unremarkable. (Tr. 328-30). Two days later, on June 19, 2011, Krueger returned to the emergency room, complaining of an excruciating right-sided headache and dizziness. (Tr. 299-303). She received pain medication, which helped somewhat, but she was admitted to the hospital for a neurology consult, as well as for evaluation of depression. (Tr. 302). During the neurology consult, it was noted that Krueger had a refractory headache, likely to be right lesser occipital neuritis. (Tr. 308). An MRI of her brain

6

showed a few chronic white matter changes, but was essentially unchanged from her March 2011 MRI. (Tr. 310, 312).

At a follow-up visit with Michigan Neurology Associates, on June 28, 2011, Krueger reported ongoing right-sided headaches, with a sense of heaviness, vomiting, neck pain, and dizziness. (Tr. 369). She reported having been to the emergency room multiple times with no resolution. (*Id.*). Dr. Voci noted that Krueger's prior craniotomy had relieved her headaches "somewhat," as they now occurred "once every couple of weeks versus once every other day." (*Id.*). At her next neurology appointment, on September 6, 2011, Krueger reported daily headaches (4/10 on the pain scale), along with nausea, vomiting, and some right-sided weakness. (Tr. 386). She received trigger point injections, was started on Lyrica, and was advised to return in one to two months. (*Id.*). At her next visit, on November 8, 2011, Krueger reported only "minimal response" from the trigger point injections, and it was noted that she had "tried and failed multiple oral medications" for her headaches. (Tr. 385). Her treating physician recommended a trial of Botox injections and prescribed a "headache cocktail" to take, as necessary, in an attempt to avoid trips to the emergency room. (*Id.*).

On January 4, 2012, Krueger presented to urgent care, complaining of a headache and dizziness, and was given pain medication. (Tr. 480-81). On March 14, 2012, she presented to a new primary care physician as anxious and tearful, complaining of ongoing headaches. (Tr. 468). On April 6, 2012, she returned to urgent care with a headache and was referred to the emergency room for imaging. (Tr. 484-85). There is no indication in the record, however, that Krueger went to the emergency room that day. Rather, she returned to her primary care physician on April 11, 2012, again complaining of a headache and right arm pain. (Tr. 466-67).

On April 23, 2012, Krueger was admitted to the hospital with an intractable migraine

headache, nausea, vomiting, and pain radiating down her right arm. (Tr. 277-88). She reported presenting to urgent care a couple of weeks earlier, saying that she had continued to have a persistent right-sided posterior headache that had progressively worsened. (Tr. 277). She had an MRI of her brain, which was "relatively stable," and an MRI of her cervical spine, which showed mild caudal extension of the cerebral tonsils through the foramen magnum. (Tr. 278, 289-90).

On April 30, 2012, Krueger returned to the University of Michigan Neurology Ataxia Clinic. (Tr. 449-51). She reported that, since her last visit, her headaches had been "essentially constant," and she also experienced dull, right-sided arm pain. (Tr. 449-50). It was noted that Krueger's headaches "have many migrainous features, and it is likely that her headaches have been transformed due to her chronic analgesic use (transformed migraine)." (Tr. 450). She was urged to reduce her use of analgesics, and repeat MRIs of her brain and cervical spine were ordered. (Tr. 451). These tests showed a nodular, irregular lesion within the posterior fossa at the level of the foramen of Magendie, suggestive of a subependymoma, as well as a puncate nonspecific focus of T2 hyperintensity in the left frontal deep white matter. (Tr. 455).

On May 9, 2012, Krueger presented to Bethany Leighton, D.O., complaining of continued headaches, along with anxiety, depression, and insomnia, and was started on Cymbalta. (Tr. 430-31). At a follow-up visit on June 6, 2012, Krueger indicated that Cymbalta was not helping her depression, and she was still having headaches. (Tr. 433-35).

On July 5, 2012, Krueger was again seen in the emergency room for a headache with nausea and vomiting, blurry vision, and pain in her right eye and arm. (Tr. 418-23). On July 16, 2012, she returned to see Dr. Leighton, indicating that she had been under a lot of stress and had had a "bad headache all month." (Tr. 436-38). She indicated that her headache had lessened after her most recent emergency room visit but that there was "no resolution." (Tr. 436). A few

8

days later, on July 21, 2012, she was back in the emergency room, complaining again of a headache with nausea and vomiting, blurry vision, and right arm weakness. (Tr. 241-46). She received IV pain medication and was discharged. (Tr. 246). On August 17, 2012, Krueger again presented to the emergency room with a headache, nausea, and vomiting. (Tr. 247-51). She received pain medication and reported that her pain improved somewhat. (Tr. 250). A few days later, however, Krueger was back in the emergency room with a headache, nausea, dizziness, and pain radiating into her right arm. (Tr. 257-60). She received pain medication, which helped her symptoms. (Tr. 259).

On August 28, 2012, Krueger returned to Michigan Neurology Associates for a follow-up evaluation. (Tr. 368). Dr. Voci noted that, following her brain surgery in 2010, she had had "irretractable headaches despite the use of multiplicity of medications." (*Id.*). She had tried numerous medications – including Depakote, Indera, Topamax, all types of triptans, and pain medications – which provided her no relief. (*Id.*). She had also received multiple headache cocktails in the hospital with only moderate relief. (*Id.*). She was referred to Dr. Rock at Henry Ford Hospital for reevaluation of her Chiari malformation. (*Id.*).

On September 4, 2012, Krueger saw Dr. Leighton regarding her anxiety, depression, chronic pain, and insomnia. (Tr. 442-44). She indicated that she had stopped taking Cymbalta because it seemed to be making her headaches worse. (Tr. 442). According to Krueger, Dr. Voci had reviewed her MRI and said that she was not suffering from migraines; rather, the tonsils on the cerebellum were spilling into her spine, and she would need another surgery. (*Id.*). She was started on Celexa and urged to follow up with Dr. Rock. (*Id.*).

On September 13, 2012, Krueger saw Dr. Rock, complaining of blurry vision, balance problems, arm pain, and symptoms of heaviness and pain. (Tr. 456-57). Dr. Rock stated:

9

> As I looked over the 2011 films, I see nothing compressing anything in the arm on the right side. I looked again at the more recent in spring of 2012 and I see similar findings. One thing is a little troubling and that is between the tonsils, there appears to be a low intensity lesion, which does not seem to enhance. Now this could be scarring from the Chiari malformation because many times we would dissect between the tonsils and so this can leave the scarring. It was there on the 2011 film, which was postop and it is there now, but it does not seem to have changed. I have to review this with our radiologist and we will obtain the preoperative films as well. We will also try to get a copy of the op note so we can see if there is anything in particular that would have lead [sic] to this if it were to be considered scar. From the symptomatic point of view, I am not actually sure what I can offer. This does not sound like an occipital neuralgia and I don't honestly have a treatment for it. At some point, if we really come up empty, we can refer her to the headache clinic here and see if there is anything more that they can recommend, but I leave that to your discretion. So for now, we will review the MRIs obtained, the preop MRI and the op note and then get back to you afterwards.

(Tr. 457).

On October 17, 2012, Krueger again underwent MRIs of her cervical, thoracic, and lumbar spines. (Tr. 401-06). The cervical MRI demonstrated a mass between the cerebellar tonsils at the level of the craniocervical junction. (Tr. 401). There was minimal enhancement at the inferior aspect of the mass that was "perhaps slightly increased" in comparison to prior examinations, but could have been due to differences in technique. (*Id.*).

On November 5, 2012, Krueger was again seen in the emergency room for a headache with nausea and vomiting. (Tr. 424-29). IV pain medication was administered, which improved her headache, and she was discharged. (Tr. 427-28).

From December 3-7, 2012, Krueger was admitted to Beaumont Hospital for depression, anxiety, and suicidal ideations and plans. (Tr. 475-79). She reported ongoing issues with headaches, which had been getting worse, as well as marital and family stress. (Tr. 475).

On March 16, 2013, Krueger was again seen in the emergency room for treatment of a headache with photophobia and nausea. (Tr. 502-09). Again, she was given IV pain medication

and sent home.  (Tr. 509).  On May 8, 2013, Krueger returned to the emergency room with a headache and vomiting and was treated with IV pain medication.  (Tr. 510-14).

From August 19-21, 2013, Krueger was admitted to the hospital with symptoms of depression and anxiety after she attempted suicide.  (Tr. 516-26).  She reported being very stressed and depressed as a result of her ongoing headaches and a breakup with her husband. (Tr. 516, 518).  On examination, her mood was severely depressed, she cried easily, and felt overwhelmed.  (Tr. 519).  She was diagnosed with major depression and assigned a Global Assessment of Functioning ("GAF")[2] score of 30.  (Id.).  On discharge, her diagnosis was the same, and her GAF score had only improved to 40.  (Tr. 525).

On September 13, 2013, Richard VanBriggle, MA, LLP, reported that he had been seeing Krueger for individual psychotherapy, on a weekly basis, since March 2012.  (Tr. 515).  He indicated that she had been seen a total of 53 times and had been diagnosed with major depressive disorder.  (Id.).  Dr. VanBriggle also indicated that most of Krueger's missed appointments were a result of her health issues, including "chronic debilitating headaches" and depression.  (Id.).

> b.     *Consultative and Non-Examining Sources*

On November 26, 2012, Krueger underwent a consultative psychological examination with Terrance Mills, L.P.  (Tr. 469-73).  She reported panic attacks, depression, and mood swings, indicating that she isolates herself from others.  (Tr. 469).  She also reported marital difficulties, indicating that her husband was verbally and emotionally abusive.  (Tr. 470).  Dr. Mills diagnosed major depressive disorder, generalized anxiety disorder, and panic disorder

---

[2]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

without agoraphobia.  (Tr. 473).  He further stated that she should be able to maintain standards of behavior in the workplace and respond to changes in the work setting, but "due to her medical problems" and her "current problems with depression and anxiety," both of these issues were "a concern."  (*Id.*).  He "strongly recommended" a psychiatric evaluation with a medication review, and suggested that psychological testing should be considered.  (*Id.*).

### 3.   *Vocational Expert's Testimony*

Kelly Stroker testified as an independent vocational expert ("VE") at the administrative hearing.  (Tr. 48-53).  The VE characterized Krueger's past relevant work as ranging from semi-skilled to skilled in nature, and from sedentary to heavy in exertion.  (Tr. 48-49).  The ALJ asked the VE to imagine a hypothetical individual of Krueger's age, education, and work experience, who could perform light work with the following additional limitations:  only occasional climbing of stairs, crouching, crawling, kneeling, stooping, or bending; must avoid hazards such as dangerous moving machinery and unprotected heights; no climbing ladders, ropes, or scaffolds; she can reach overhead only occasionally with her dominant right upper extremity; and she is restricted to work that is low stress, self-paced, simple, routine, and repetitive.  (Tr. 49-50).  The VE testified that the hypothetical individual would not be capable of performing Krueger's past relevant work.  (*Id.*).  However, the VE testified that the hypothetical individual would be capable of performing the jobs of inspector (2,000 jobs in the state of Michigan), assembler (4,000 jobs), and hand packager (4,000 jobs).  (Tr. 50).

### D.   **The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Krueger is not disabled under the Act.  At Step One, the ALJ found that Krueger has not engaged in substantial gainful activity since June 19, 2010 (her alleged onset date).  (Tr. 14).  At Step Two, the ALJ found that

Krueger has the severe impairments of Chiari malformation (type I) with suboccipital headaches status post-craniotomy, cervical decompression, and laminectomy; and major depressive disorder.  (Tr. 14-15).  At Step Three, the ALJ found that her impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 15-16).

The ALJ then assessed Krueger's residual functional capacity ("RFC"), concluding that she is capable of performing light work with the following additional limitations:  only occasional climbing of stairs, crouching, crawling, kneeling, stooping, or bending; must avoid hazards such as dangerous moving machinery and unprotected heights; no climbing ladders, ropes, or scaffolds; she can reach overhead only occasionally with her dominant right upper extremity; and she is restricted to work that is low stress, self-paced, simple, routine, and repetitive.  (Tr. 16-20).

At Step Four, the ALJ determined that Krueger is unable to perform any of her past relevant work.  (Tr. 20).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Krueger is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 20-21).  As a result, the ALJ concluded that Krueger is not disabled under the Act.  (Tr. 21).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v.*

14

*Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

### F.      Analysis

The ALJ considered Krueger's treatment for Chiari malformation, headaches, and depression and concluded that, despite these conditions, she can perform a limited range of light work.   (Tr. 16-20).   In reaching this conclusion, the ALJ did not fully credit Krueger's complaints that the frequency and intensity of her headaches render her unable to work on a regular and continuing basis.   (*Id.*).   In her motion for summary judgment, Krueger argues that the ALJ's credibility determination is not supported by substantial evidence.   (Doc. #11 at 17-27).   The Court agrees.

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant is invaluable, and should not be discarded lightly."   *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (internal quotations omitted); *see also Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008).   This Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Krueger] are reasonable and supported by substantial evidence in the record."   *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

When assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged …."   *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x

370, 371 (6th Cir. 2011). Here, the ALJ made this finding, concluding that Krueger's impairments could reasonably be expected to cause the alleged symptoms. (Tr. 17).

After making such a finding, the ALJ must then "consider the entire case record" to evaluate the "intensity, persistence, and functionally limiting effects of the symptoms" to determine the extent to which these symptoms affect the individual's ability to do basic work activities. *Soc. Sec. Rul. 96-7p*, 1996 WL 374186, at *1 (July 2, 1996); *see also* 20 C.F.R. §404.1529(c). A non-exhaustive list of factors to be considered by the ALJ includes: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, the individual has received; (6) any measures the individual uses to relieve his or pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions. *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. §404.1529(c). In her written decision, the ALJ must "provide a sufficiently specific explanation for [her] credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight." *Malcolm v. Comm'r of Soc. Sec.*, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (internal citations omitted); *see also Winhoven v. Comm'r of Soc. Sec.*, 2013 WL 4483463, at *12 (E.D. Mich. Aug. 19, 2013) ("[T]his Court does not sit to rubber stamp [an ALJ's credibility] assessment; instead, it has the responsibility of determining whether substantial evidence supports it."). In this case, a careful reading of the ALJ's decision reveals that the reasons articulated for discounting Krueger's credibility are not supported by substantial

evidence.[3]

In assessing Krueger's credibility, the ALJ first stated that, "At the hearing, the claimant interestingly contradicted much of what had previously been submitted on her behalf."  (Tr. 17). Specifically, the ALJ wrote:

> For example, the claimant testified that she does not do laundry because her washer and dryer are in the basement and she does not use stairs. However, a review of both Function Reports reveals specific indications of the claimant performing laundry duties.  At the hearing, she testified she has lived in the same house since 2009.  Further, the claimant testified that she does not use a computer or watch television secondary to headaches or dizziness.  Nevertheless, a review of the third-party Function Report from her husband reveals that she uses the internet and watches television as hobbies/interests and that she does so "fine" and with no changes since her alleged condition began.  What's more, the claimant testified that she does no shopping and that she does not socialize with others.  In stark contrast to such, the aforementioned function report reveals the claimant talks with others on the phone "all the time" and on a "daily" basis, and that she shops in stores.  Also of worthy mention, while the claimant alleges an onset of work-preclusive symptomatology as of June 2010 (the claimant testified she stopped working in June 2010 due to frequency of headaches), she testified that she became a licensed cosmetologist (hair and nails) in 2011.  The claimant further testified that she simply takes ibuprofen for her alleged work-preclusive headaches.

(Tr. 17 (internal citations omitted)).

There are numerous problems with this analysis.  To begin with, while it was proper for the ALJ to consider the "type, dosage, effectiveness, and side effects" of the medication Krueger takes to alleviate her pain or other symptoms, as contemplated in 20 C.F.R. §404.1529(c)(3), her

---

[3] In her motion, Krueger first argues that the ALJ failed to provide a sufficiently specific explanation for discounting her credibility because she used so-called "boilerplate language" that previously has been criticized by courts.  (Doc. #11 at 18-19 (citing *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012)).  This argument is without merit, as courts have held that the use of such template language is only grounds for reversal "where the ALJ used the boilerplate language 'without linking the conclusory statements contained therein to the evidence in the record or even tailoring the paragraph to the facts at hand ….'"  *Isaac v. Comm'r of Soc. Sec.*, 2013 WL 4042617, at *14 (E.D. Mich. Aug. 9, 2013) (quoting *Bjornson*, 671 F.3d at 645).  Here, the ALJ provided a sufficiently specific explanation for her credibility determination; the problem is that the reasons articulated by the ALJ for discounting Krueger's credibility are not supported by substantial evidence in the record.

analysis of that matter is significantly flawed. (Tr. 17). The ALJ incorrectly stated that Krueger "testified that she simply takes ibuprofen for her alleged work-preclusive headaches." (*Id.*). Indeed, as the Commissioner concedes, Krueger testified at the hearing that she was taking Vicodin for pain at that time. (Doc. #12 at 19 (citing Tr. 43)). Moreover, the record clearly demonstrates that Krueger has taken *numerous* strong medications for her headaches during the relevant time period, including Fentanyl, Fioricet, Celexa, Effexor, Toradol, Midrin, Maxalt, Naprosyn, Depakote, Indera, and Topamax. (Tr. 43, 206, 368, 371). And, in August 2012, Dr. Voci noted that, following her brain surgery in 2010, Krueger had had "irretractable headaches despite the use of multiplicity of medications." (Tr. 368). Thus, the ALJ's decision to discount Krueger's credibility – at least in part – because she purportedly testified to taking only over-the-counter medication for her headaches is not supported by substantial evidence. Considering that the heart of this case concerns Krueger's alleged debilitating headaches, the ALJ's error is all the more acute.

Additionally, as set forth above, in discounting Krueger's allegations of disability, the ALJ relied heavily on purported inconsistencies between her hearing testimony and statements made in earlier disability reports. (Tr. 17). The problem, however, is that many of these alleged contradictions are not necessarily inconsistent, and those that are can be explained by factors that the ALJ failed to discuss. For example, the ALJ found Krueger less than fully credible because she "testified that she does not do laundry because her washer and dryer are in the basement," while a prior function report "reveals specific indications of the claimant performing laundry duties …." (Tr. 17 (citing 188)). In reality, however, Krueger indicated in her November 2012 function report that she only did "a little bit" of laundry each day, had to "rest often," and "can't lift laundry up the stairs husband has to." (Tr. 188). Krueger's husband, Scott, confirmed that he

carried the laundry hamper up the stairs. (Tr. 180). Thus, the ALJ's determination that there are inconsistencies between the testimony and function reports on this issue is not supported by substantial evidence.

Similarly, the ALJ discounted Krueger's credibility because she "testified that she does no shopping and that she does not socialize with others," while her husband reported that she "talks with others on the phone 'all the time' and on a 'daily' basis, and that she shops in stores …." (Tr. 17 (citing Tr. 181-82)). It is true that in their November 2012 function reports, Krueger and her husband both reported that she was able to shop in stores (picking up her medication or doing "light grocery shopping") and talk on the phone with friends. (Tr. 181-82, 189-90). By the time of the December 2013 hearing, however, Krueger testified that her husband did the grocery shopping and she did not "get together with friends or relatives, talk on the phone at all with people." (Tr. 39-40).

In evaluating the above evidence, the ALJ appears not to have considered that more than one year passed between the time the reports were completed (in November 2012) and the time of the hearing (in December 2013), and how the medical evidence in the record during that interim period of time supported or belied the prior evidence. It is certainly conceivable that Krueger's physical ability and psychological motivation to perform activities such as shopping and talking on the phone with others decreased during this period of time. This is particularly true given that Krueger was admitted to the hospital twice during this timeframe, once when she was contemplating suicide and again when she attempted suicide. (Tr. 475-79, 516-26). Thus, the medical evidence of record supports a worsening in her condition over this period of time, and the ALJ should have considered and discussed the impact of this most significant evidence on Krueger's credibility.

Moreover, the record also indicates that Krueger and her husband were experiencing significant marital difficulties during the relevant time period, a fact that the ALJ acknowledged at the hearing.   (Tr. 31-32).   Indeed, Krueger reported to Dr. Mills at her November 2012 consultative examination that her husband was verbally and emotionally abusive, was having his mail "delivered to another address," and had specifically told her after she emerged from brain surgery, "I wish you would have died … I do not want to take care of a sick wife."  (Tr. 470).   At the time Krueger attempted suicide in August 2013, she reported stress associated with a "breakup with her husband."  (Tr. 516).   Although the ALJ acknowledged the couple's marital problems at the hearing, the ALJ did not appear to take that fact into account when she credited the information provided by Krueger's husband.

Similarly, the ALJ discounted Krueger's credibility because she testified at the hearing that "she does not use a computer or watch television secondary to headaches or dizziness," while her husband indicated in a third-party function report that "she uses the internet and watches television as hobbies/interests and that she does so 'fine' and with no changes since her alleged condition began …."  (Tr. 17 (citing Tr. 182)).   To begin with, the Commissioner concedes that the ALJ mischaracterized Krueger's testimony:  she testified only that she does not go online or check email, not that she "does not use a computer."  (Doc. #12 at 11 (citing Tr. 39)).   Regardless, for the reasons articulated above – namely, the amount of time that passed between the reports and the hearing, the fact that Krueger's condition appears to have worsened during that period of time, *see supra* at 19, and the conflict between Krueger and her husband – the ALJ's analysis of this particular issue is not supported by substantial evidence.

Finally, the ALJ discounted Krueger's credibility because she found her allegations of disability at odds with the objective medical evidence of record.  (Tr. 18-20).  For example, the

ALJ specifically found Krueger less than fully credible because, despite seeking urgent or emergent care for her headaches on numerous occasions, she was "regularly given pain medication and released." (Tr. 18). Although there were occasions in which this was the case, the ALJ omits mention of the fact that Krueger was admitted to the hospital with uncontrolled headaches on at least five occasions. (Tr. 277-88, 302, 345, 350-53, 361). Moreover, even when Krueger was "given pain medication and released," the record evidence does not indicate that this treatment "brought her headaches under control," as the Commissioner asserts. (Doc. #12 at 12). Rather, on multiple occasions, Krueger was treated and released, only to return to the emergency room just days later, suggesting that the treatment she received did not, in fact, "control" her headaches. (Tr. 247-51, 257-60, 299-303, 322-27, 340-45, 346, 354-58). Moreover, although IV pain medication administered to Krueger in the emergency room provided "some" or "mild" relief at times (Tr. 302, 338, 369), her treating physicians continued to note that there was no resolution of her headaches (Tr. 369, 436). In summary, the ALJ overgeneralized in finding that Krueger was "regularly given pain medication and released," and her decision to discount Krueger's credibility on this basis is not supported by substantial evidence.

The ALJ also discounted Krueger's allegations because "[n]otes dated June [6,] 2012 reveal the claimant had no complaints and that she was attending church and talking with others." (Tr. 18 (citing Tr. 433-35)). Again, the ALJ's statement is incorrect: Krueger did not have "no complaints" at her June 6, 2012 doctor's visit; rather, she reported feeling "MORE depressed," and Dr. Leighton's notes indicate:

> … just doesn't think that [Cymbalta is] helping at all … and was just really depressed a couple of weeks ago. Pt able to talk with people at church … and has a counselor that she has been talking to …. Still HA [headache] – not quite as bad. [H]asn't had to go to ER since last

> visit…Patient complaining of nausea, vomiting – with HAs [headaches] sometimes…Patient complaining of tingling/numbness, headache = no change.

(Tr. 433-34). Thus, the ALJ's conclusion that Krueger's allegations of disability are less than fully credible because she had "no complaints" at this doctor's visit also is not supported by substantial evidence.

Finally, it bears mentioning that the ALJ simply failed to discuss several significant pieces of medical evidence. For example, an April 2012 MRI of Krueger's brain and cervical spine showed mild caudal extension of the cerebral tonsils through the foramen magnum. (Tr. 278, 289-90). It appears, then, that the tonsils on Krueger's cerebellum were spilling into her spine, and she was recommended for another brain surgery, a significant piece of medical evidence the ALJ should have discussed. (Tr. 368, 442-44). Similarly, what the ALJ referred to as Krueger's "brief inpatient treatment on two occasions (December 2012 and August 2013) with noted significant stressors at the time" (Tr. 19), were actually two multi-day admissions for depression and anxiety, one of which followed a suicide attempt (Tr. 475-79, 516-26). And, finally, the ALJ purported to give "great weight" to Dr. Mills' statements that Krueger "would not have difficulty maintaining standards of behavior" and would most likely be able to respond to changes in the work setting. (Tr. 18 (citing Tr. 469-73)). In doing so, however, the ALJ omitted mention of Dr. Mills' concurrent opinion that while Krueger *should* be able to maintain standards of behavior in the workplace and respond to changes in the work setting, "due to her medical problems" and her "current problems with depression and anxiety," both of these issues were "a concern." (Tr. 473). The ALJ also omitted mention of the fact that Dr. Mills "strongly recommended" a psychiatric evaluation with a medication review, and suggested that psychological testing should be considered. (*Id.*).

In short, in discounting Krueger's credibility, the ALJ relied heavily on a clearly

mistaken belief that Krueger testified to taking only over-the-counter medication for her headaches and had "no complaints" by June of 2012. (Tr. 17-18). She also relied on purported inconsistencies between Krueger's hearing testimony and statements made a year before in disability reports. (*Id.*). In doing so, however, the ALJ omitted mention of several key pieces of medical evidence which provide support for Krueger's allegations of disabling pain, at least during the period of time closer to the hearing date. As this Court has recognized, where "the ALJ's selective reliance on 'fragments' of the record amounts to a distortion of the record it cannot be said that substantial evidence supports the credibility determination." *Peltier v. Comm'r of Soc. Sec.*, 2014 WL 7272760, at *9 (E.D. Mich. Dec. 18, 2014) (quoting *Laskowski v. Apfel*, 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000)). For all of these reasons, the ALJ's decision to discount Krueger's credibility is not supported by substantial evidence, and remand is required. *See, e.g., Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011) ("In sum, while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence."); *Johnson v. Comm'r of Soc. Sec.*, 2013 WL 4669997, at *11 (E.D. Mich. Aug. 30, 2013) (remanding where the ALJ's credibility determination was not supported by substantial evidence).

## III.   CONCLUSION

For foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [12] be DENIED, Krueger's Motion for Summary Judgment [11] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.

Dated: October 19, 2015                s/David R. Grand
Ann Arbor, Michigan                    DAVID R. GRAND
                                    United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 19, 2015.

                                    s/Eddrey O. Butts
                                    EDDREY O. BUTTS
                                    Case Manager